**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

NICHOLAS KONTODIAKOS,
YEHIA ELLIS,
*and all others Individuals similarly situated,*

Plaintiffs,

v.                                                          Civil Action No. 2:23-cv-459

EXPERIAN INFORMATION SOLUTIONS INC.;

CELLCO PARTNERSHIP dba VERIZON WIRELESS,

and

CONSUMERINFO.COM, INC. dba EXPERIAN CONSUMER SERVICES,

Defendants.

**AMENDED COMPLAINT**

Plaintiffs Nicholas Kontodiakos, Yehia Ellis, and all other putative Class members ("Class members"), by and through their attorneys, for the Amended Complaint against Defendants Experian Information Solutions Inc. ("Experian"), Cellco Partnership dba Verizon Wireless (Verizon"), and ConsumerInfo.com, Inc. ("CIC") dba Experian Consumer Services state as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*

2.      Mr. Kontodiakos was the victim of identity theft that he suffered as follows:

- CIC, which is an affiliate of Experian that the latter uses to sell products to consumers who otherwise contact Experian for their FCRA-promised free credit report, allows a stranger to open a "credit monitoring" account through

1

CreditWorks ("CreditWorks"), its credit monitoring service, using only the Plaintiff's basic information, and thereby receive Plaintiff's full credit report.

- Within days, this unknown fraudster then applied for a Verizon cell phone account using that information, as well as a bogus North Carolina address and bogus e-mail address.

- This was made possible when Experian sold Verizon the Plaintiff's private credit report notwithstanding the obvious bogus information.

- Not unexpectedly, after Verizon opened the account, the Fraudster never paid it and the major default was reported on Plaintiff's credit report.

- Mr. Kontodiakos then made multiple attempts to dispute the inaccurate reporting, which disputes were never substantively investigated by Experian or Verizon.

3. Plaintiff Kontodiakos continues to prosecute his individual "did not investigate" claims against Experian and Verizon for their violations of 15 U.S.C. §§1681e(b) and 1681i, and 15 U.S.C. § 1681s-2(b), respectively.

4. Further, Plaintiffs Kontodiakos and Ellis bring class claims against Experian and CIC for their violations of 15 U.S.C. §§ 1681b and 1681e(a) in the unlawful sale and furnishing of their private credit reports without a lawful basis to have done so. They regularly sell private consumer reports to identity thieves masquerading as an online consumer.

### JURISDICTION & VENUE

5. This Court has federal question jurisdiction under 28 U.S.C. § 1331.

6. Venue is proper under 28 U.S.C. § 1391(b) and Local Civil Rule 3(C) because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in this District and Division. Mr. Kontodiakos resides here where all of his damages were suffered.

### PARTIES

7. Plaintiff Nicholas Kontodiakos is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

8.      Plaintiff Yehia Ellis is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

9.      Defendant Experian is a foreign corporation, authorized to conduct and regularly conducting business in the Commonwealth of Virginia.  Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

10.     Defendant CIC is an affiliate of Experian, a wholly-owned subsidiary of Experian Holdings, Inc. It is a "reseller" as defined and governed under the FCRA, 15 U.S.C. § 1681a(u). It assembles and merges information contained in Experian's database concerning consumers and it does so in order to furnish these reports to third parties.

11.     Further, CIC is also a "user" of Experian consumer reports to the extent it is not a Reseller.

## FACTUAL ALLEGATIONS

### The Fair Credit Reporting Act Requires Substantive Investigations and Prohibits Mere "Parroting" of Experian's Creditor-Customers

12.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry." *See* S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *Id.* at 36570 (statement of Rep. Sullivan). "In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols.,*

3

*Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

13.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Id.*

14.     Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

15.     Section 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

16.     It has long been the law that a CRA, such as Defendant Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the disputed item. *E.g.*, *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir.

2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT- LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted*, No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate").

17. That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

18. Further, as Experian is aware, this Court has held that even though the term "investigation" is not used in Section 1681e(b), Defendant Experian has a duty to conduct a reasonable initial investigation pursuant to Sections 1681e(b) and 1681i(a). This duty is "central" to the CRA's duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [Sections 1681e(b) and 1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived" *Id*. at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

19. It has long been the law—since 1970—that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

5

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

20.     Today, furnishers such as Defendant Verizon have their own independent duties under the FCRA. Principally, those duties are found at 15 U.S.C.§ 1681s-2. When a furnisher receives a consumer's dispute through a CRA, such as Experian, it is required to conduct an investigation of that dispute. 15 U.S.C. § 1681s-2(b). That investigation must be substantial and not superficial. *Johnson v. MBNA*, 357 F.3d 426, 430 (4th Cir. 2004) (defining "investigation" as "a searching inquiry.")

21.     In addition to the accuracy purposes motivating the FCRA, the statute was also enacted to protect "the consumer's right to privacy" and to ensure the "confidentiality" and "proper utilization of [a consumer's] information in accordance with the requirements" of the statute.  15 U.S.C. § 1681.

22.     In furtherance of this important objective the FCRA allows a CRA to furnish a consumer report only for very specific purposes "and no other". 15 U.S.C. § 1681b(a).  And a user, such asCIC, is prohibited from "us[ing] or obtain[ing] a consumer report for any purpose" other than the very few allowed.  15 U.S.C. § 1681b(f).

23.     Also in furtherance of these important confidentiality and privacy objectives, FCRA § 1681e(a) demands that a consumer reporting agency – including both Experian and CIC– "[M]aintain reasonable procedures designed to … limit the furnishing of consumer reports to the purposes listed under section 1681b", "require that prospective users of the information identify themselves", and "verify the identity of a new prospective user and the uses certified by such

---

[1] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair- credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

prospective user prior to furnishing such user a consumer report." Experian and CIC were prohibited from "furnish[ing] a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b[.]" Comparable restrictions separately govern resellers such asCIC. 15 U.S.C. § 1681e(e).

## KONTODIAKOS INDIVIDUAL CLAIM FACTS

### *Plaintiff Kontodiakos Discovers and Disputes Experian's Reporting of Derogatory Information Regarding a Verizon Account on His Credit Reports*

24. Mr. Kontodiakos served several years in the United States Navy until his recent retirement. He is a disabled veteran.

25. He applied for a loan with Vantage Recreational Finance on March 9, 2022, to purchase a boat after his retirement.

26. He was denied financing.

27. Mr. Kontodiakos was denied because the bank found an outstanding bill from Verizon that went to collections. This information was inaccurate because he did not open an account or authorize anyone to open an account on his behalf with Verizon. In fact, he did not have any debt associated with Verizon.

28. In an effort to be proactive, Mr. Kontodiakos took steps to remedy this problem.

29. First, he filed an incident report with the Norfolk Police Department on March 10, 2022. He stated in his report that he was a victim of identity theft and cited the Verizon account indicating an outstanding balance of $4,850.

30. Plaintiff disputed the inaccurate Verizon account to Experian on one or more occasions during the last two years. For example, and without limitation, Mr. Kontodiakos sent a detailed dispute letter to Defendant Experian on December 15, 2022.

31. In each instance, Experian's dispute results revealed that the Verizon account remained and had been verified.

32. By February 21, 2023, Experian's report continued to include the derogatory Verizon collection amount.

***Defendant Experian Forwarded Plaintiff Kontodiakos'***
***Dispute to Defendant Verizon, Which Did Nothing***

33. Upon Mr. Kontodiakos' dispute of the Verizon account, Experian, on or about a date(s) better known to Experian, forwarded the dispute to Verizon using an electronic system called "e-OSCAR."

34. e-OSCAR is an industry-wide process where disputes are electronically communicated to furnishers, and dispute results are sent back to the CRA.

35. e-OSCAR is also the system by which Verizon has agreed it will accept such consumer disputes from CRAs.

36. Under such circumstances, Verizon became obligated under the FCRA to investigate Plaintiff's disputes.

37. Mr. Kontodiakos' disputes of the Verizon account should have triggered Verizon to reinvestigate the complaint. Unfortunately, Verizon verified its inaccurate derogatory reporting. This response confirmed that Experian communicated Plaintiff's disputes to Verizon and the information furnished to Experian was at all times inaccurate.

38. Defendant Verizon thus failed to reasonably reinvestigate Plaintiff's disputes that it received from Experian in violation of § 1681s-2(b)(1)(A) and (B) of the FCRA.

39. Defendant Verizon further violated 15 U.S.C. § 1681s-2(b)(1)(E) when it failed to correct the account after receiving Plaintiff's disputes from Experian prior to the commencement of this action.

*Plaintiff Kontodiakos' Suffered Actual Harm*

40.     Experian continued to report the derogatory Verizon account on Plaintiff's credit reports, despite being notified that this information was false.

41.     Plaintiff's attempts to resolve these matters with Defendants were to no avail.

42.     In fact, Plaintiff's credit was significantly destroyed by Defendants' refusal to correct the inaccurate reporting.

43.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

   a.   Stress associated with being denied credit and associated delays in applying for future credit;

   b.   Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes, etc.;

   c.   Loss of time attempting to cure the error;

   d.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life; and

   e.   Stress associated with attempting to resolve this matter.

*Defendants' Failure to Investigate Conduct Was Willful*

44.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

45.     Proof of willfulness includes, for example, "evidence that other consumers have

9

lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

46.     As detailed above, the FCRA sections at issue here, and informative guidance, have been around now for over 50 years. The language of Section 1681e(b) has not changed. Defendants' dispute investigation obligations under Sections 1681i(a) and 1681s-2(b) have not changed since at least 1997. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

47.     Experian has received many thousands of disputes and other complaints sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting. Verizon has also been subject to many thousands of consumer complaints and numerous federal lawsuits for the same misconduct alleged here.

48.     Defendants knew or should have known of this dispute and litigation history. They use and have access to PACER to investigate and monitor such consumer complaints.

49.     The CFPB has maintained a Consumer Complaint database since 2011. It receives a small percentage of the total consumer credit reporting complaints made nationwide. Many more complaints are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

50.     Experian regularly receives unredacted consumer dispute details from this database.

51.     Since the database began accepting complaints, the CFPB has sent over 570,000 consumer credit reporting complaints to Experian.

52.     Just in the last twelve (12) months alone, Experian has been sued by consumers

10

alleging violations of the FCRA over 2,000 times.

53.    Most of these lawsuits alleged that the CRAs violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

54.    Proportionately similar, Verizon has also been sued in federal court over 400 times for consumer credit claims by consumers—most involving alleged violations of the FCRA.

55.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Experian on notice of the failures of its dispute investigation procedures in ensuring accuracy, numerous federal district and circuit courts have placed Experian on notice that it may not merely "parrot" what its creditor-customer tells it if the consumer has provided a substantive and detailed dispute.

56.    Experian had actual notice from numerous other courts that its blind "parroting" was unlawful. *See, e.g., Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011); *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006).

57.    Defendants have long had specific notice from courts about their expected conduct in dispute investigations. The seminal circuit court decision addressing Section 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Trans Union's notice was so substantial that this Court instructed the jury in a Section 1681i(a) trial in which Experian was also a defendant:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed… that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other

11

sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05CV888 (E.D. Va. Aug. 27, 2007). Thus, particularly in this Court, Experian was as aware as Trans Union that the procedure to merely "parrot" was unlawful.

58.     Experian has also been repeatedly criticized by federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

59.     In 2015, a large group of state Attorneys General forced a consent order from CRAs by which they were required to develop procedures necessary to comply with the FCRA.  The AG Settlement required amongst many changes and mandates that the CRAs comply with § 1681i(a).[2]

60.     The AG Settlement also required the CRAs to conduct significant research and data gathering. This included creating a "working group" to address these issues and to develop special procedures to handle disputes like in this case. Notwithstanding these requirements, Experian did not meaningfully comply with the AG Settlement in these regards.

61.     Experian is also aware of substantive and detailed criticism by public interest groups about its automated consumer dispute verification ("ACDV") system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by CRAs when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors, National Consumer Law Center, February 2019.

---

[2] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News- Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

12

("NCLC Report").[3]

62.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian, and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

63.    Among many of the CRAs' accuracy failures, the NCLC Report discovered:

- Insufficient Information Conveyed and Considered in Investigation. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- Failure to Transmit Information Submitted by the Consumer. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- Perfunctory Credit Bureau Investigations. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- Credit Bureaus Always Side with Furnishers. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

---

[3] Available at https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

NCLC Report at 6.

64.     While Experian's notice has spanned four decades and over 600,000 public complaints or lawsuits, Verizon's notice has also been substantial. Verizon has received tens if not hundreds of thousands of consumer disputes, hundreds of federal lawsuits and various other communications that its automated dispute procedures were unlawful.

65.     Further, Verizon and its lawyers regularly review and are on notice of both the FCRA text and its application and interpretation by federal courts.

66.     Verizon was long aware of the seminal decision, *Johnson v. MBNA*, 357 F.3d 426, 430 (4th Cir. 2004).

67.     Despite all this statutory, judicial, regulatory, and public interest notice and criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

68.     Defendants' procedures imposed on Plaintiff and similarly situated consumers pose an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

### PLAINTIFF KONTODIAKOS INDIVIDUAL CLAIMS FOR RELIEF

### COUNT I - Violation of § 1681e(b) of the FCRA
#### *Defendant Experian*

69.     Plaintiff Kontodiakos realleges and incorporates the foregoing paragraphs as if fully set out herein.

70.     Defendant Experian willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files it published and maintained concerning Mr. Kontodiakos.

14

71.     As a result of this conduct, action and inaction of Experian, Mr. Kontodiakos suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, and denial of a loan.

72.     Even after Plaintiff's disputes put Experian on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of its creditor-customers, Experian ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring the maximum possible accuracy of Plaintiff's credit reports.

73.     Experian furnished multiple consumer reports to third parties containing the inaccurate tradeline information and it did so after receiving notice of these inaccuracies.

74.     Experian's conduct, action and inaction were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

75.     As a result of Experian's violations of 15 U.S.C. § 1681e(b), Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

76.     Mr. Kontodiakos is entitled to recover his costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II - Violation of § 1681i of the FCRA
### *Defendant Experian*

77.     Plaintiff Kontodiakos realleges and incorporates the foregoing paragraphs as if fully set out herein.

78.     Experian willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with

15

which to filter and verify disputed information in Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

79.    As a result of Experian's violations of 15 U.S.C. § 1681i, Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

80.    Experian's conduct, action, and inaction was willful, rendering Experian liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

81.    Plaintiff Kontodiakos is entitled to recover his costs and attorneys' fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III - Violation of §§ 1681s-2(b) of the FCRA
### *Defendant Verizon*

82.    Plaintiff Kontodiakos realleges and incorporates the foregoing paragraphs above as if fully set out herein.

83.    Defendant Verizon violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiff's disputes after the said disputes were forwarded to Verizon by Experian.

84.    On one or more occasions within the past two years, by example only and without limitation, Verizon violated 15 U.S.C. § 1681s-2(b)(1)(C) by failing to correctly report the results of an accurate investigation to Experian.

85.    Defendant Verizon violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Experian prior to the commencement of this action. This failure to correct Plaintiff's

16

information resulted from Verizon's failure to investigate as articulated herein, after Verizon received notice of Plaintiff's disputes from Experian.

86.     On one or more occasions within the past two years, by example only and without limitation, Verizon violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by Experian.

87.     Based on the manner in which Experian responded to Plaintiff's disputes—representing that Verizon had "verified" the supposed accuracy of its reporting— Plaintiff alleges that Experian did in fact forward the Plaintiff's disputes via ACDV to Verizon.

88.     Verizon understood the nature of Plaintiff's disputes when it received the ACDVs from Experian.

89.     Notwithstanding the above, Verizon follows a standard and systematically unlawful process when it receives an ACDV dispute. Basically, all Verizon does is review its own internal computer screens for the account and repeat back to the ACDV system the same information it already reported to Experian.

90.     When Verizon receives a consumer dispute through e-OSCAR, it does not conduct a substantive review of any sort to determine whether the information already in its computer system itself is inaccurate.

91.     As a result of Verizon's violations of 15 U.S.C. §§ 1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages including but not limited to loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

92.     As a result of Verizon's violations of 15 U.S.C. § 1681s-2(b), Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

93.    Verizon's FCRA violations were willful, rendering it liable for actual, statutory damages and punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative, Verizon was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

94.    Plaintiff Kontodiakos is entitled to recover his costs and attorneys' fees from Verizon in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## CLASS ACTION CLAIM FACTS

### *Experian and CIC Operate as Integrated CRAs*

95.    Defendant CIC operates as an integrated CRA with Experian and other third-parties on a cooperative and for-profit basis and in the regular course of business, assembles and evaluates consumer credit information for the purpose of furnishing consumer reports to third parties on its single integrated website, which publishes consumer disclosures and includes dispute processing, and also evidenced in its trademark application:

Financial information provided by electronic means; providing information in the field of finance and credit; Providing an on-line computer database in the field of financial information related to credit reporting, credit rating, credit scores, and credit disputes; Providing on-line financial calculators, simulators, score factor assessments and credit score analyzer; Credit card services, namely, credit card cancellation and replacement services in the event of theft or loss; Credit consultation

EXPERIAN CREDITWORKS, Registration No. 5324316.

96.    As the FCRA sets forth, a consumer report is:

Any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d).

18

97.    CIC and Experian operate from the same website, www.experian.com, and all ofCIC's products and services are accessed through www.experian.com.

98.    When a consumer visits www.experian.com and clicks on "Free credit Report", that consumer is presented with the option to select a CreditWorks "Basic Plan" without any payment or credit card verification:



99.    Further, CIC in the regular course of its business, collects data from other consumer reporting agencies, such as Trans Union and Equifax, as illustrated in its offer for "CreditWorks Premium":

> You understand and agree that ECS, and its service providers, may, from time to time, provide products, services, features and/or functionality to you, and that they shall be offered pursuant to the same authorization that you provided to ECS for ECS to obtain your credit report and/or credit score(s) on a recurring basis to provide them to you to review while you have an account with ECS.

> You further understand and agree that, by establishing an account with ECS, or submitting your order or enrolling for any Service, you have provided "written instructions" in accordance with the FCRA for ECS and its service providers, to obtain and use the information you have provided, and your credit report and/or credit score(s) to notify you of credit opportunities and other products and services that may be available to you through ECS or through unaffiliated third parties (as explained in the section below entitled "General Description of Services"). *Id.*

100.    CIC gains contingent profits from third party offers accepted by consumers based on the consumer credit evaluation withCIC:

In addition, you further understand and agree that, if you request certain credit or loan offers as part of any Service, such as prequalified personal loan offers, you are authorizing ECS and its service providers to send your information to lending partners on your behalf, and have provided "written instructions" in accordance with the FCRA to such credit and lending partners to obtain information from your personal credit profile or other information from one or more consumer reporting agencies, such as TransUnion, Experian or Equifax, to prequalify you for credit or loan options, offers or other credit opportunities, including prequalified personal loan offers, to share such credit opportunities with ECS, or to use such information to assist you in completing a credit or loan application.

You understand and agree that ECS receives compensation for the marketing of credit opportunities or other products or services available through third parties, and that this compensation may impact how and where such credit opportunities, products or services appear on a Website (including, for example, the order in which they appear). *Id.*

101.    CIC compiles data from Experian, Equifax, and Trans Union, into reports which contain FICO credit scores—the sole purpose of which are to "[serve] as a factor in establishing the consumer's eligibility for . . . credit. . ." *Id.*

102.    The entire business model of CIC is furnishing consumer reports to both third parties and consumers:

You further understand and agree that, by establishing an account with ECS, or submitting your order or enrolling for any Service, you have provided "written instructions" in accordance with the FCRA for ECS and its service providers, to obtain and use the information you have provided, and your credit report and/or credit score(s) to notify you of credit opportunities and other products and services that may be available to you through ECS or through unaffiliated third parties.[4]

103.    Specifically, CIC collects, obtains, and assembles the information for the purpose of providing it to third parties, who then obtain and use the information from Defendant in order to determine a consumer's eligibility for, among other things, credit and insurance offers and targeted marketing materials since CIC receives a monetary kickback from any consumer's acceptance of an offer that was made based upon their CreditWorks profile.

---

[4] https://www.experian.com/help/terms-and-conditions.html (last accessed February 8, 2024)

104. CIC engages in interstate commerce by operating in commerce, via the internet, with citizens of all fifty states:

> This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. This arbitration provision shall survive termination of this Agreement.

*Id.*

105. As demonstrated above, Defendant operates as a CRA because (1) in exchange for compensation; (2) Defendant regularly assembles information on consumers; (3) for the purpose of furnishing consumer reports; and (4) by means of interstate commerce.

106. CIC cannot evade the Fair Credit Reporting Act and escape designation as a "consumer reporting agency" by insisting that it only uses FCRA-covered data for certain functions and leaves the FCRA-governed actions to Experian.

107. Efforts by a consumer reporting agency to "circumvent or evade treatment as a "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis, as defined under section 603(p) of the FCRA, 15 U.S.C. 1681a(p)" is legally ineffective including by "Corporate organization, reorganization, structure, or restructuring[.]" 12 C.F.R Part 1022.

108. CIC requires consumers, including Plaintiffs and Class members, to submit non-public Personal Identifying Information via its website and in the ordinary course of its business operations of "verifying" a consumer's identity before gaining access to their Experian consumer credit file.

109. However, the website contains identification verification vulnerabilities that allows identity thieves to access consumer credit files via the website and unbeknownst to Plaintiffs and Class members.

110. As a result of identity thieves accessing Plaintiffs' and Class members' consumer credit files via CreditWorks, CIC then proceeded to gather, store, and republish the private, non-public Personal Identifying Information of Plaintiffs and Class members without their consent, due to insufficient online security and lackadaisical identity verification allowing identity thieves to access entire consumer credit files of unsuspecting individuals.

111. CIC has failed to safeguard all consumer data via its Experian website, which gives identity thieves unfettered access to essentially any consumer's credit file and information.

112. Even when Plaintiff and Class members attempted to notify CIC of this issue by initiating disputes of fraudulent accounts that were a result of the website's lack of security, CIC failed to take the complaints seriously, failed to conduct any investigation, and continued to report the resulting fraudulent often negatively reporting accounts that had been set up as a result of Experian's improperly secured website.

### *Nicholas Kontodiakos (Virginia)*

113. Evidence recently disclosed revealed that personal identifying information that did not actually belong to Plaintiff Kontodiakos, specifically the address of "5547 Pine View Dr., Winston-Salem, NC" (the "Pine View Address") and an unassociated email address, was utilized on Experian's CreditWorks website by an identity thief who was able to access Plaintiff Kontodiakos' entire consumer credit disclosure via the internet.

114. A quick online property search shows that, due to a foreclosure, the Pine View Address was not even inhabited at the time that the identity thief used the address to access Plaintiff Kontodiakos's credit file.

115. Further, no skip tracing links the Pine View Address to Plaintiff Kontodiakos.

116. After accessing Plaintiff Kontodiakos' consumer credit file in May of 2021, the identity thief was then able to utilize his personal identifying information to commit fraud and opened a fraudulent Verizon account.

117. The fraudulent Verizon account appeared on Plaintiff Kontodiakos' consumer credit report thereafter, with an opened date of May 2021 and the same inaccurate, nonmatching Pine View Address.

118. The identity thief opened the Verizon account using the Pine View Address, the same fraudulent email address, and Plaintiff Kontodiakos's personally identifying information— which the identity thief obtained by accessing Plaintiff Kontodiakos's credit file through CreditWorks.

119. To make matters worse, when Plaintiff Kontodiakos attempted to dispute the fraudulent Verizon account, that was a result of the negligent design of the CreditWorks website, Experian ignored him and the fraudulent Verizon account remained within his consumer credit disclosure.

120. When Plaintiff asserted his legal rights in this Court in connection with this case, Defendant Experian moved to Compel Arbitration [ECF No. 17], based upon the alleged contract that was entered into by the identity thief when he fraudulently accessed the Plaintiff's consumer credit file on the Experian website via the CreditWorks service.

121. Experian eventually withdrew the Motion to Compel [ECF No. 28], based upon its own investigation and determination that the personal identifying information used to access CreditWorks did not match and had never been associated with Plaintiff Kontodiakos.

### *Yehia Ellis (New York)*

122. Plaintiff Ellis discovered he was a victim of identity theft as a minor.

123.    The thief used Ellis's information to open approximately seven fraudulent consumer accounts in Ellis's name.

124.    Plaintiff Ellis attempted to obtain a copy of his Experian credit file online through www.annualcreditreport.com, the website created by the CRAs to provide consumers with "no strings attached" copies of their credit files as required by 15 U.S.C. § 1681j(a).

125.    Because many of the ID verification questions were based on the details of fraudulently opened accounts, Ellis was unable to obtain a copy of his Experian credit file using www.annualcreditreport.com.

126.    In an attempt to obtain a copy of his credit file over the phone, Plaintiff Ellis called Experian.

127.    During that phone call with Experian, Plaintiff Ellis learned that the identity thief had opened a CreditWorks account in Ellis's name, using Ellis's personally identifying information.

128.    As a result of Experian's website vulnerabilities and the resulting identity theft, Plaintiffs and Class members' Personal Information and consumer credit files were compromised resulting in Plaintiffs and Class members suffering one or more of the following injuries:

a.      force arbitration without an agreement to arbitrate;

b.      incidents of identity fraud and theft, including unauthorized bank activity;

c.      fraudulent credit card purchases, and damage to their credit;

d.      money and time expended to prevent, detect, contest, and repair identity theft, fraud, and/or other unauthorized uses of Personal Information;

e.      lost opportunity costs and loss of productivity from efforts to mitigate and address the adverse effects of the Data Breach, including but not limited to efforts to

research how to prevent, detect, contest, and recover from misuse of their Personal Information; and

f.       loss of information and opportunity to control how their Personal Information is used.

129.    Furthermore, Plaintiffs and Class members have suffered, and/or will face an increased risk of suffering in the future, the following injuries:

a.       money and time lost as a result of fraudulent access to and use of their financial accounts are still reporting on Plaintiffs and Class members' consumer credit disclosures;

b.       loss of use of and access to their financial accounts and/or credit;

c.       impairment of their credit scores, ability to borrow, and/or ability to obtain credit;

d.       lowered credit scores resulting from credit inquiries following fraudulent activities;

e.       costs and lost time obtaining credit reports in order to monitor their credit records;

f.       money, including fees charged in some states, and time spent placing fraud alerts and security freezes on their credit records;

g.       money and time expended to avail themselves of assets and/or credit frozen or flagged due to misuse;

h.       costs of credit monitoring that is more robust than the services being offered by CIC through CreditWorks;

i.       anticipated future costs from the purchase of credit monitoring and/or identity theft protection services; costs and lost time from dealing with administrative consequences of the Data Breach, including by identifying, disputing, and seeking

25

reimbursement for fraudulent activity, canceling compromised financial accounts and associated payment cards, and investigating options for credit monitoring and identity theft protection services;

j.    money and time expended to ameliorate the consequences of the filing of fraudulent tax returns; and

k.    continuing risks to their personal information, which remains subject to further harmful exposure and theft as long as CIC fails to undertake appropriate, legally required steps to protect the personal information in its possession.

## CLASS ACTION CLAIMS AGAINST CREDITWORKS

136.    Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), seeking damages and equitable relief on behalf of the following class:

> All natural persons who (a) were the subject of a consumer report furnished by Experian to CIC within the five years before the filing of this action; (b) where CIC furnished the report to a third party; (c) where the consumer about whom the report related disputed the tradeline(s) for an account(s) opened on or after the date on which CIC records show the person as having signed up for CreditWorks based on a claim of not his/hers, identity theft or fraud; (d) where the consumer did not in fact open the CreditWorks account (the "Nationwide Class").
>
> Excluded from the class are all persons who have signed a written release of their claim, and/or are counsel in this case, or employed by the Federal Judiciary.

137.    **Numerosity**. Plaintiffs allege that the CIC Class is so numerous that joinder of the claims of all Class members is impractical. Experian operates as one of the largest CRAs in the nation and it funnels all of its online disputes through CIC via CreditWorks. Given the common nature of identity theft, and the way in which Experian and CIC have pushed consumers to sign up for CreditWorks, the class size will easily exceed hundreds or thousands of consumers. The names and addresses of the Class members are identifiable through documents maintained by

26

Defendants, and the Class members may be notified of the pendency of this action by publication or mailed notice.

138.    **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative Class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether CIC had a statutorily permissible purpose to use the putative Class members' consumer reports; (b) whether CIC failed to maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under section 1681b; (c) whether CIC's conduct constituted a violation of the FCRA; and (e) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the rights of the Plaintiffs  and putative Class members.

139.    **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of the same FCRA provisions, 15 U.S.C. §§ 1681b(a), 1681a(a), and 1681h(a). These claims challenge the consumer reporting procedures of Experian and do not depend on any individualized facts. For purposes of class certification, Plaintiffs seek only statutory and punitive damages. The recovery of class statutory and punitive damages is ideal and appropriate in circumstances like this one, where injuries are particularized and concrete, but difficult to quantify. In addition, Plaintiffs are entitled to the relief under the same causes of action as the other members of the class.

140.    **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiffs nor their counsel have any interests that

27

might cause them not to vigorously pursue this action. Plaintiffs are aware of their responsibilities to the putative class and have accepted those responsibilities.

141. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the members of the class predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. Given the complex and extensive litigation necessitated by Defendant's conduct, using individual prosecution to obtain the statutory and punitive damages sought by each member would prove burdensome and expensive. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are otherwise disempowered and unable to afford to bring their claims individually. Further, most consumers affected by Defendant's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

**COUNT IV – Violation of § 1681b(a) of the FCRA**
*Experian and CIC Class Claim*

136. Plaintiffs and Class members reallege and incorporate the foregoing paragraphs as if fully set out herein.

28

137. Experian and CIC willfully violated 15 U.S.C. § 1681b(a) by willfully and recklessly accessing, attaching, publishing and selling Plaintiffs' and Nationwide Class members' credit profile without a permissible purpose or authorization under the FCRA.

138. As a result of this conduct, action and inaction of CIC, each Plaintiff and Class members suffered damage by having their consumer credit reports and Personal Identifying Information ("PII") accessed by unauthorized identity thieves.

139. Experian and CIC furnished the consumer reports to third parties without a permissible purpose or authorization under the FCRA.

140. CIC's conduct, action and inaction were willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

141. Experian's conduct, action and inaction were willful, rendering it liable for statutory and punitive damages to Plaintiffs Kontodiakos and Ellis and all putative class members in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

142. Plaintiffs and Class members are entitled to recover costs and attorney's fees from CIC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT V - Violation of § 1681e(a) of the FCRA
### *Experian and CIC Class Claim*

143. Plaintiffs and Class members reallege and incorporate the foregoing paragraphs as if fully set out herein.

144. Experian and CIC willfully and negligently violated 15 U.S.C. § 1681e(a) by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title by failing to make reasonable efforts to implement procedures that would verify the identity of a new or prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report.

145. CIC's conduct, action, and inaction was willful, rendering CIC liable for statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

146. Experian's conduct, action and inaction were willful, rendering it liable for statutory and punitive damages to Plaintiffs Kontodiakos and Ellis and all putative class members in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

147. Plaintiffs and Class members are entitled to recover costs and attorneys' fees from CIC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT VI- Violation of § 1681e(e) of the FCRA**
***CIC Class Claim***

148. Plaintiffs and Class members reallege and incorporate the foregoing paragraphs above as if fully set out herein.

149. CIC willfully and negligently violated 15 U.S.C. § 1681e(e) by procuring consumer reports for the purpose of resale (or any information in the report) when it failed to disclose the identity of the end-user of the report and did not comply with 1681b as to a permissible purpose allowed under the FCRA.

150. CIC's conduct, action, and inaction was willful, rendering CIC liable for statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

151. Plaintiffs and Class members are entitled to recover costs and attorneys' fees from CIC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT VII- Violation of § 1681b(f) of the FCRA**
***CIC Class Claim***

152. Plaintiffs and Class members reallege and incorporate the foregoing paragraphs above as if fully set out herein.

153. Alternatively, CIC willfully and negligently violated 15 U.S.C. § 1681b(f) when consumer reports were obtained without an authorized purpose in accordance with 1681b.

154. CIC's conduct, action, and inaction was willful, rendering CIC liable for statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

155. Plaintiffs are entitled to recover costs and attorneys' fees from CIC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT VIII-Negligence**
*CIC Class Claim*

156. Plaintiffs and Class members reallege and incorporate the foregoing paragraphs as if fully set out herein.

157. Upon accepting and storing the Personal Identifying Information of Plaintiffs and Class members in its computer systems and on its networks, CIC undertook and owed a duty to Plaintiffs and Class members to exercise reasonable care to secure and safeguard that information with commercially reasonable and standard methods. CIC knew that the Personal Identifying Information was private and confidential and should be protected as private and confidential.

158. CIC has full knowledge of the sensitivity of consumer's credit files and the types of online threats that could harm consumers, such as Plaintiffs and Class members, if the Personal Identifying Information and consumer credit files were wrongfully accessed and disclosed.

159. By collecting and assuming the responsibility to store Personal Identifying Information of consumers and their associated consumer credit file information, CIC had a duty

of care to use reasonable means to secure and prevent disclosure of the Personal Information and safeguard it from theft.

160. CIC owed a duty of care not to subject or expose Plaintiffs and Class members' Personal Information to an unreasonable risk of harm because they were the foreseeable and probable victims of any inadequate website security practices.

161. The CreditWorks trademark application acknowledges the same significant issues and duty surrounding identity theft related to consumer personal identifying information and consumer credit disclosures:

> Consultation in the field of data and identity theft; Financial identity monitoring services for fraud protection purposes; Providing consumer credit report monitoring information to facilitate the detection and prevention of identity theft and fraud via the internet; Monitoring consumer credit consumer credit reports and scores and providing an alert as to any changes therein to facilitate the detection and prevention of identity theft and fraud; Fraud resolution and customer assistance services provided in the event of identity theft and fraud affecting credit; Providing monitoring, alters and reports based on internet surveillance and protection of identity and identification theft.

CREDITWORKS Registration No. 5341175.

162. CIC owed numerous duties to Plaintiffs and to Class members, including the following:

 a. exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Personal Information in its possession;

 b. protect Personal Information using reasonable and adequate security procedures and systems that are compliant with standard industry practices; and,

 c. implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

163. CIC also breached its duty to Plaintiffs and the Class members to adequately protect and safeguard Personal Information by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured consumer Personal Information and consumer credit disclosures. Furthering their dilatory practices, CIC failed to provide adequate supervision and oversight of the Personal Information with which they are entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather Personal Information of Plaintiffs and Class members, misuse the Personal Information and intentionally disclose it to third-parties without consent.

164. CIC knew, or should have known, of the risks inherent in collecting and storing Personal Information, the vulnerabilities of its website, identity verification, and data security systems, and the importance of adequate security.

165. CIC knew, or should have known, that their website, data systems, and networks did not adequately safeguard Plaintiffs' and Class members' Personal Information.

166. CIC breached its duties to Plaintiffs and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Personal Information of Plaintiffs and Class members.

167. Because CIC knew that vulnerabilities of its systems would damage millions of individuals consumer credit files, including Plaintiffs and Class members, CIC had a duty to actively and adequately protect their data systems and the Personal Information stored therein.

168. CIC had a special relationship with Plaintiffs and Class members. Plaintiffs' and Class members' willingness to entrust CIC with their Personal Information was predicated on the understanding that CIC would take adequate security precautions. Class members had no say in

33

whether CIC used their Personal Information. Moreover, only CIC had the ability to protect its systems and the Personal Information from known and foreseeable vulnerabilities.

169. Plaintiff and Class members were within the class of person that were intended to be protected against the exact type of harm that resulted from CIC's Data Breach. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting companies in possession of Nonpublic Private Information ("NPI").

170. CIC's own conduct created a foreseeable risk of harm to Plaintiffs and Class members and their Personal Information. CIC's misconduct included failing to: (1) secure its systems, despite knowing their vulnerabilities, (2) comply with industry standard security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

171. CIC also had independent duties under state and federal laws that required CIC to reasonably safeguard Plaintiffs' and Class members' Personal Information and promptly notify them about the website vulnerability and compromised data.

172. CIC breached its duties to Plaintiffs and Class members in numerous ways, including:

    a. failing to adopt, implement and maintain reasonable security measures, protocols, practices, and adequate computer system, data, and website security practices in order to safeguard Personal Information of Plaintiffs and Class members;

    b. failing to adequately monitor the security of their computer systems, data bases, and website;

c.       allowing unauthorized access to Class members' Private Information and consumer credit disclosures;

d.       failing to comply with the minimum industry standard data security protocols prior to and during the period of the ongoing Data Breach;

d.       failing to detect in a timely manner that Class members' Private Information had been compromised;

b.       creating a foreseeable risk of harm through the misconduct previously described; and,

e.       failing to timely and accurately disclose that Plaintiffs' and Class members' Personal Information and consumer credit disclosures had been improperly acquired or accessed.

173.    Through CIC's acts and omissions described in this Complaint, including CIC's failure to provide adequate security and its failure to protect Personal Information of Plaintiffs and Class members from being foreseeably captured, accessed, copied, disseminated, stolen and misused, CIC unlawfully breached its duty to use reasonable care to adequately protect and secure Personal Information of Plaintiffs and Class members during the time it was within CIC's possession or control.

174.    The law further imposes an affirmative duty on CIC to timely disclose the unauthorized access and theft of the Personal Information to Plaintiffs and the Class members so they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Personal Information. To date, CIC has not provided sufficient information to Plaintiffs and Class members regarding the extent of the unauthorized access and

continues to breach its disclosure obligations to Plaintiffs and Class members thereby preventing them from taking meaningful, proactive steps to secure their financial data and accounts.

175.    Through CIC's acts and omissions described in this Complaint, including CIC's failure to provide adequate security and its failure to protect Personal Information of Plaintiffs and Class members from being foreseeably captured, accessed, disseminated, stolen, and misused, CIC unlawfully breached its duty to use reasonable care to adequately protect and secure Personal Information of Plaintiffs and Class members during the time it was within CIC's possession or control.

176.    Upon information and belief, CIC improperly and inadequately safeguarded Personal Information of Plaintiffs and Class members in deviation of standard industry rules, regulations, and practices at the time of the unauthorized access. CIC's failure to take proper security measures to protect sensitive Personal Information of Plaintiffs and Class members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Personal Information and consumer credit disclosures of Plaintiffs and Class members.

177.    CIC's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect Personal Information and consumer file disclosures; failing to conduct regular security audits; failing to provide adequate and appropriate supervision of persons having access to Personal Information of Plaintiffs and Class members; and failing to provide Plaintiffs and Class members with timely and sufficient notice that their sensitive Personal Information had been compromised.

178.    Neither Plaintiffs nor the other Class members contributed to the Data Breach and subsequent misuse of their Personal Information as described in this Complaint.

36

179. Plaintiffs and Class members had no ability to protect their NPI that was in, and remains in, CIC's possession.

180. Defendant has admitted that the NPI of Plaintiffs and Class members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

181. But for CIC's wrongful and negligent breach of duties owed to Plaintiffs and Class members would not have been compromised.

182. There is a close causal connection between CIC's failure to implement security measures to protect the NPI of Plaintiffs and the Class members and the harm, or risk of imminent harm suffered by Plaintiffs and the Class members. The NPI of Plaintiffs and Class members was comprised and accessed as the proximate result of CIC's failure to exercise reasonable care in safeguarding such NPI by adopting, implementing, and maintaining appropriate security measures.

183. As a direct and proximate cause of CIC's conduct, Plaintiffs and the Class suffered damages including, but not limited to: 1.) invasion of privacy; 2.) theft of NPI, lost or diminished value of NPI; 3.) damages arising from identity theft such as fraudulent accounts and lines of credit, derogatory reporting, limited access to lines of credit that would normally be available, and false or fraudulent charges; 4.) lost opportunity costs associated with lost time and effort to mitigate the actual and potential impact and consequences of the Data Breach such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, closely reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports; 5.) increase in spam calls, texts, and/or emails; 6.) nominal damages; and 7.) the continued and certainly increased risk to the NPI which : a.) remains unencrypted and available for unauthorized third parties to access and abuse; and b.) remains

backed up in CIC's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect consumer NPI.

184.    As a direct and proximate result of CIC's negligence, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to: anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

185.    Additionally, as a direct and proximate result of CIC's negligence, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of the NPI, which remain in CIC's possession and is subject to further unauthorized disclosures so long as CIC fails to undertake appropriate and adequate measures to protect the NPI in its continued possession.

186.    Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

187.    CIC's negligent conduct is ongoing, in that it still holds the NPI of the Plaintiffs and Class members in an unsafe and insecure manner.

188.    Plaintiffs and Class members are also entitled to injunctive relief requiring CIC to: a.) strengthen its data security systems, standards, and monitoring procedures; b.) submit to annual audits of those systems and monitoring procedures; and c.) continue to provide adequate credit monitoring to all Class members.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiffs therefore respectfully requests that this Court certify the Class as pled, award individual and classwide damages as pled; award attorney's fees and costs under the FCRA; award declaratory and/or equitable relief; award Plaintiffs and Class members pre-judgment and post-judgment interest at the legal rate; and award other relief as the Court deems appropriate.

Dated: December 6, 2024                                      Respectfully Submitted,

**NICHOLAS KONTODIAKOS, et al**

By:   */s/ Mark C. Leffler*
      Leonard A. Bennett, Esq., VSB #37523
      Craig C. Marchiando, Esq., VSB #89736
      Mark C. Leffler, Esq., VSB #40712
      **CONSUMER LITIGATION ASSOCIATES, P.C.**
      763 J. Clyde Morris Blvd., Ste. 1-A
      Newport News, VA 23601
      Telephone: (757) 930-3660
      Facsimile: (757) 930-3662
      Email: lenbennett@clalegal.com
      Email: craig@clalegal.com
      Email: mark@clalegal.com

      Drew D. Sarrett, VSB # 81658
      **CONSUMER LITIGATION ASSOCIATES, P.C.**
      626 East Broad Street, Suite 300
      Richmond, VA  23219
      Telephone: (804) 905-9900
      Fax: (804) 905-9902
      Email:  drew@clalegal.com

      Kristi C. Kelly, VSB #72791
      KELLY GUZZO, PLC
      3925 Chain Bridge Road, Suite 202
      Fairfax, Virginia 22030
      Telephone: (703) 424-7572
      Facsimile: (703) 591-0167
      Email: kkelly@kellyguzzo.com

      *Counsel for Plaintiff*